UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION



BOBBY ALLEN JOHNSON,           )
                               )
        Plaintiff,             )
                               )
vs.                            )        CIVIL ACTION No. CV-95-S-3022-NE
                               )
ONEITA INDUSTRIES, INC.,       )
ONEITA INDUSTRIES CULLMAN,     )
DARLENE ABSHER, both           )
individually and as agent of   )        **ENTERED**
Defendants Oneita Industries,  )
Inc. and Oneita Industries     )        MAR 13 1997
Cullman,                       )
                               )
        Defendants.            )
_____)

### MEMORANDUM OPINION

This action is before the court on defendants' motion for
summary judgment. Plaintiff generally asserts he was subjected by
defendants Oneita Industries, Inc., and Oneita Industries Cullman
("Oneita") to unlawful discrimination because of his gender in
violation of Title VII of the Civil Rights Act of 1964, as amended
by the Civil Rights Act of 1991 (42 U.S.C. §§ 2000e et seq.). He
claims Oneita subjected him to a sexually hostile work environment,
and thereafter terminated his employment in retaliation for his
complaints about unwelcome sexual harassment by his supervisor,
defendant Darlene Absher. (August 22, 1996 Pretrial Order, at 2.)
Plaintiff also asserts state law claims against Oneita, alleging
that it negligently trained and supervised supervisory employees,
such as defendant Darlene Absher. Finally, plaintiff asserts state
law claims for assault and battery and invasion of privacy against
defendant Darlene Absher. Upon consideration of the briefs,

39

pleadings, and evidentiary submissions of the parties, this court concludes that defendants' motion is due to be granted in part, but denied in part.[1]

## I.   STATEMENT OF FACTS

### A.   Johnson's Employment with Oneita

Oneita owns a plant in Cullman, Alabama, which manufactures towels, blankets, washcloths, gowns, bibs, and other textile products.  (Absher Deposition, at 18.)  The employees of that plant are predominantly female; the few males who work there are normally engaged in management or maintenance positions.   (Anderson Deposition, at 30.)   Oneita hired plaintiff, Bobby Allen Johnson, as a "Snap Operator"[2] on June 27, 1992. (Plaintiff's Deposition, at 42-45; Plaintiff's Exhibit 8: Oneita Employee Listings.)   Johnson's fiancé (referred to in the record only as "Patty") also worked at the plant until January of 1994. On June 8, 1994, the two were married.  (Plaintiff's Deposition, at 10.)

Although Johnson does not remember the exact date, sometime during the summer or late spring of 1993, he was offered the

---

[1] The court has considered the following briefs in relation to the subject motion: (1) movants' initial submission in response to Exhibit C of the court's order; (2) respondent's statement of facts and brief in opposition to motion for summary judgment in response to Exhibit C of the court's order; and (3) movants' reply submission in response to Exhibit C of the court's order.

The court has also considered the following evidentiary submissions: (1) movants' evidence in support of its initial submission in response to Exhibit C of the court's order; (2) respondent's evidence in support of its opposition to summary judgment in response to Exhibit C of the court's order; and (3) movants' supplemental evidence in support of their reply submission in response to Exhibit C of the court's order.

[2] A "Snap Operator" places snaps on baby clothes.  (Plaintiff's Deposition, at 45.)

2

position of "Service Operator." (Plaintiff's Deposition, at 57.)
A service operator provides sewing machine operators with bundles
of cut goods from the cutting department, and with supplies and
parts such as snaps, prongs, studs, and labels. (Plaintiff's
Deposition, at 58-60.) Johnson accepted the position and Darlene
Absher thereafter became his supervisor.[3]

Johnson claims Absher sexually harassed him. Their work
stations were side by side, and the two were in close proximity
everyday. (Id., 128-29.) Johnson had no involvement with Absher
outside work. Therefore, each of the alleged incidents occurred at
Oneita's Cullman plant. (Id., 119.)

## B. Absher's Alleged Harassment of Johnson

Johnson alleges he was subjected by Absher to the following
incidents of harassment:

Darlene Absher's grabbing Johnson by his buttocks
and making sexually explicit comments in December 1993,
and on repeated occasions thereafter.

Darlene Absher requested Johnson to take his shirt
off so that Darlene Absher could repair a hole in the
shirt. Darlene Absher stating to the other employees
that she had him where she wanted Johnson [-] in a dark
corner naked.

Darlene Absher's stating to Johnson in November of
1994, "Shut up and Kiss me. You don't have a problem
with that, do you?" she then stated to Johnson she could
kiss very well.

Darlene Absher's putting her unlisted telephone
number in Johnson's Jacket pocket and telling him if he
ever needed anything to call her.

---

[3] Absher began working at Oneita on June 11, 1979. (Absher Deposition, at
10.)

3

(Plaintiff's Complaint, ¶ 10.) Although not mentioned in his complaint, Johnson said in deposition that Absher grabbed his testicles on one occasion. (Plaintiff's Deposition, at 163.) Johnson admits, however, that Absher never proposed sexual intercourse. (*Id.*, 137.)

### 1. "Buttocks grabbing"

Johnson alleges that, virtually every day he and Absher worked together, she either pinched or grabbed his buttocks and legs. (*Id.*, at 118.) He also says she would wrap her arms around his body and hug him. (*Id.*, 122.) Although Johnson claims such events occurred on a daily basis, he specifically recalls only one incident, which he said occurred either in July or August of 1994. (*Id.*, 115.) Johnson described that incident as follows:

> I was bent over folding my gowns, ... Darlene had walked by and pinched me on the tail, turned around and looked at all the people and started laughing <u>and then looked at my wife, which was my fiancé then and then laughed at her. She knew it made her mad.</u>

(*Id.*, 115-16 (emphasis added).) Johnson's account is not entirely credible. He later admitted his future wife left the employment of Oneita in January of 1994. Therefore, she would not have been present when that incident allegedly occurred. (*Id.*, 123-25.) Accordingly, it is more likely the incident occurred (if it occurred) in December of 1994.[4] Absher, of course, denies she ever grabbed, hugged, or flirted with Johnson. (Absher Deposition, at 47-50.)

---

[4] *See* note 11 *infra*.

4

## 2.   "In a dark corner naked"

Johnson also described an incident that evolved from him wearing a shirt with a hole or tear that needed mending.   He is very unspecific about the date of the incident, saying only that it occurred sometime during 1993 or 1994.    In any event, Absher offered to mend his shirt, and told Johnson to step behind his desk and remove his shirt. (Plaintiff's Deposition, at 133.)   Johnson's and Absher's desks were located against a wall in the corner of the plant that was not well lit.  (Id., 129-32.)   Johnson complied with Absher's request, but immediately dressed himself with another shirt while Absher repaired the hole.  (Id., 133.)   Johnson changed clothes behind his desk, which is approximately five feet tall, and, therefore, only "the top of his shoulders" and head were exposed.   (Id., 136.)   As Johnson was changing clothes, Absher allegedly said: "I got him where I want him, in the dark, naked." (Id., 136.)   Johnson alleges Absher laughingly made the comment "in front of everybody."  (Id., 133.)   Absher admits mending the shirt, but denies making that statement. (Absher Deposition, at 48, 65.)

Johnson admits being grateful that Absher mended his shirt, because it was new.  (Plaintiff's Deposition, at 137.)   His primary concern about the incident was that "it got back to my wife."  (Id., 137.)[5]

---

[5] Johnson does not recall if his wife was still working at the plant at the time of the shirt mending incident.  (Plaintiff's Deposition, at 138.)

5

### 3.    "Shut up and kiss me"

Johnson alleges that, on November 15, 1994, while he was at his desk ordering supplies, a country song entitled "Shut Up and Kiss Me" played on the radio. (Plaintiff's Deposition, at 140; Plaintiff's Affidavit submitted to the EEOC, ¶ H.) He claims Absher was at her desk, putting on lipstick. (Plaintiff's Deposition, at 140.) Absher allegedly leaned over to Johnson, "close enough that her hair was on [his] hair," and whispered in his ear "shut up and kiss me. ... You don't have a problem with that do you, ... I hear I do it very well." (Id., 140-41.) Johnson walked away, and the two had no further discussions about the incident. (Id., 143.) Absher denies that it occurred. (Absher Deposition, at 48.)

### 4.    "If you ever need anything, call me"

Johnson claims he found a note from Absher in his jacket pocket reading: "If you ever need anything, call me." Then followed her home telephone number. (Plaintiff's Deposition, at 159.) Johnson discovered the note as he was leaving the plant, and gave it to a co-worker who wanted Absher's telephone number. (Id.) Once again, Johnson does not remember when the incident occurred; he says only that it was at a time of a year when it was cold, because he was wearing a jacket. (Id., 160.) Johnson never discussed the matter with Absher. (Id., 159-60.)

Absher denies she surreptitiously placed a note in Johnson's jacket, but admits she once gave him her unlisted, home telephone number. She did so "when his sister's baby had passed away and he

6

was going to have to be off work." (Absher Deposition, at 81.)
Her purported purpose for doing so was:

> [b]ecause my home number is unlisted and I told him if he
> needed to get in touch with me about work or anything or
> when he might be coming back, if it didn't work out to
> where he could call me at work during the day that he
> could call me at home.

(Absher Deposition, at 81.) Johnson is unsure, but admits the
incident could have occurred around the time Absher claims.
(Plaintiff's Deposition, at 160.)

### 5. Touching intimate body parts

The most gripping incident of all was remembered by Johnson
only during his deposition. He relates an occasion when, while
delivering bundles to the sewing machine operators and he had both
arms full, Absher came up behind him, thrust her hands inside each
of his front pockets, and continued to walk with him as her fingers
wrapped around each of his testicles. (Id., 163, 173.)

Curiously, Johnson made no mention of that incident in either
his EEOC charge or the complaint filed herein. In fact, Johnson is
not sure if he ever mentioned that occurrence to anyone at Oneita.
(Id., 216.) He claims to have forgotten it, until he recalled it
during deposition. (Id., 216.)

### C. Oneita's Sexual Harassment Policy

Oneita has enforced a "Harassment/Discrimination Policy" since
1988. (Plaintiff's Exhibit 9: Oneita Harassment Discrimination
Policy.) Johnson was aware of Oneita's policy: he had seen an

7

explanatory poster on the employee bulletin board.[6]  (Plaintiff's Deposition, at 274.)  The policy defines harassment and outlines procedures for presenting and investigating claims.  (Plaintiff's Exhibit 9, at 2.)  Complaints are to be reported to the employee's personnel representative, supervisors, or other members of management; the personnel representative and Oneita's Human Resource Department, in turn, are to ensure that a thorough investigation is conducted.  (Id.)

Oneita also has an "Open Door Policy," which provides that employee complaints "will be resolved at the employee's closest possible management level, but will be processed upward until a resolution is reached."  (Plaintiff's Exhibit 7:  Oneita's Open Door Policy, at 19.)  To that end, an aggrieved employee has the initial option of presenting a complaint to his or her immediate supervisor, or skipping the immediate supervisor and taking the complaint to the Human Resource Representative.  (Id.)  "The employee is not obligated to disclose the reason for skipping the Immediate Supervisor."  (Id.)  If the complaint is not resolved at the level of initial filing, then the employee, with the assistance of the Human Resource Representative, may proceed up the chain of command to the Plant Manager, the Functional Area Director, the Functional Area Vice President, and finally, the President of the

_____

[6] The Human Resource Department is required to post a summary of the policy where employees may readily find it.  (Plaintiff's Exhibit 9, at 2.)

8

company.[7] (*Id.*)   Posters which illustrate the "Open Door Policy" are required to be displayed on employee bulletin boards in the plant. (*Id.*, 20.)

## D.   Johnson's Complaints to Oneita

Johnson claims Absher threatened him about complaining of her behavior.   He says "[s]he reminded me that she was my supervisor and that there was really nothing I could do, because she had the power to mow me down."   (Plaintiff's Exhibit 1:   October 7, 1996 Affidavit of Bobby Allen Johnson, at 2.)

At the time, the Cullman plant did not have a plant manager but, instead, four "team leaders": (1) Joan Anderson; (2) Mike Duncan;   (3)   Debbie   Smith;   and   (4)   Randy   Yates.      (Anderson Deposition, at 34.)   Garvin Few was Director of Retail over the Cullman   facility:     a   position   above   that   of   plant   manager. (Defendants' Exhibit 6:   March 18, 1996 Affidavit of Garvin Few.)

Johnson claims he first complained to Joan Anderson, Absher's immediate supervisor, in September or October of 1994, but obtained no results. (Plaintiff's Exhibit 1: October 7, 1996 Affidavit of Bobby Allen Johnson, at 2.)   Johnson said this about Anderson's conduct:

> I   believe   that   Joan   Anderson   communicated   my complaint to Darlene Absher instead of anyone higher in management   because   soon   after   I   complained,   Darlene Absher began retaliating against me.     It was apparent from observing Ms. Anderson and Ms. Absher while together

---

[7] The policy also requires management to respond to the plaintiff's complaints within the following time frames: (1) Immediate Supervisor – 2 Days; (2) Plant Manager – 2 days; (3) Functional Area Director – 5 days; (4) Functional Area Vice President – 7 days; and (5) President – 7 days. (Plaintiff's Exhibit 7, at 20.)

9

> that they were very close friends.  Because of their friendship, Ms. Anderson also changed the agreement that she made with me regarding my need to miss a certain amount of work in order to carry both of the jobs I had.

(*Id.*)  For her part, Anderson denies that Johnson complained to her about Absher's alleged sexual harassment.  (Anderson Deposition, at 61.)

Johnson said he had intended to leave Oneita in September of 1994 to take another job but, instead, he and Anderson came to an agreement which allowed him to work both jobs.  Anderson agreed that Johnson's tardiness and absence at Oneita caused by working a second job would not count against his attendance record. (Defendants' Exhibit 9:  Statement Drafted by Deese.)  Johnson asserts that after Absher discovered he had complained, she issued Johnson an attendance warning in December of 1994, which was contrary to his agreement with Anderson.  (Plaintiff's Deposition, at 109.)  Absher also issued a reprimand to him for placing the wrong labels on clothing.[8]  (Absher Deposition, at 50.)

After Johnson's failure to receive satisfaction from Joan Anderson, he next complained to Debbie Smith.   (Plaintiff's Deposition, at 146.)  Johnson told Smith about Absher's harassment and also complained that Absher left work early on several occasions, thereby placing extra responsibilities on him.  (*Id.*, 147.)  Smith asked Johnson if he could prove that Absher was leaving work.  (*Id.*,  148.)  Johnson presented a phone bill of

---

[8] The record does not reveal when that reprimand for placing the wrong labels was given.

10

Marie Wilson, presumably a co-worker, to prove that Absher was not attending work regularly.[9]

As is often the case with Johnson, he is unsure when he conferred with Debbie Smith. (Plaintiff's Deposition, at 157-58.) The "bill date" on the telephone statement Johnson presented to Smith at their meeting is "November 14, 1994." (Defendants' Exhibit 11.) Thus, the meeting between Smith and Johnson could not have occurred prior to that date.

Johnson told Smith he "was going farther up in management than her if [he] had to" (Plaintiff's Deposition, at 150), but he nevertheless agreed to allow Smith three weeks to investigate his claims before proceeding to the next level. (*Id.*, 151.) Neither party has submitted Smith's deposition, so the record is unclear as to what exactly she did in relation to Johnson's complaint. Apparently she reported his claims to higher management, however, because Herbert Fleming, Oneita's president, soon learned of Johnson's allegations.[10]

**B.   Oneita's Investigation**

Michelle Deese served as Human Resources Director for the Cullman plant during the time of the alleged harassment. Deese was

---

[9] Johnson asserts that he took a message for Absher on November 11, 1994, at 2:47 p.m. and that Marie Wilson's phone bill supported that allegation. (Plaintiff's Deposition, at 153.) Although Johnson's reasoning as to why that phone bill establishes his claim is unclear, the date of the phone bill does help establish when he met with Debbie Smith.

[10] Smith possibly informed Fleming of the allegation. The statement of claim drafted by Deese, and agreed to by Johnson, states that "another employee had called Herb Fleming and had mentioned the sexual harassment that I had been subjected to." (Defendants' Exhibit 9.)

11

not permanently located in Cullman, however. Rather, she constantly traveled to and from the company's various plants and South Carolina headquarters. She nevertheless visited the Cullman plant on a weekly basis.

On December 6, 1994, while at Oneita's corporate offices in South Carolina, Deese was informed by Oneita's president that a sexual harassment complaint involving a male employee at the Cullman plant had been lodged. (Deese Deposition, at 24, 30.) Deese immediately made plans to leave for the Cullman facility. (*Id.*, 33.)

She arrived in Cullman on December 8, 1994, and began her investigation. She first interviewed Johnson. He mentioned each of the occurrences discussed above, with the notable exception of the testicle grabbing incident. Later that day, Deese met with Darlene Absher; Joan Anderson was present during that discussion. (Deese Deposition, at 75.) Deese began by telling Absher of Johnson's charges, and "[s]he looked shocked." (*Id.*) Absher denied any wrongdoing. (*Id.*, 76-77.) Absher said, if she did have any physical contact with Johnson, "it would have been in the same way I would have touched any employee on the floor." (*Id.*, 76.) Deese concluded the meeting by telling Absher the following things:

> I told her that I would be investigating this, that I would be talking to people and that she needed to know that she was not to in any way, fashion, or form be touching or be close to him. I wanted her to just keep her distance from him but I wanted her to work with him the same way she had been working with him, that I wanted absolutely nothing, no retaliation to happen on that floor, and that I better not hear of anything that even looked like retaliation on the floor.

12

(Deese Deposition, at 77-78.)

Over the next couple of days, Deese interviewed co-employees
who might have witnessed some of the alleged events.   Deese
telephoned those persons at their homes, rather than talking to
them at the plant during their work shifts.   Several admitted they
had seen Absher touch Johnson's buttocks, but Deese also gathered
that some of those employees harbored animosity for Absher, because
she had reprimanded them in the past.[11]   (Deese Deposition, at 105-
07.)

After Deese concluded her investigation, she returned to
Oneita headquarters in South Carolina.  She compiled her notes, and
drafted a proposed complaint.  (*Id.*, 68.)  Deese sent the proposed
complaint to Johnson who, in turn, had Vernon Padgett, a lawyer,
review it.   Padgett talked to Deese by telephone, and sent a
facsimile message to the same effect, dated December 15, 1994,
saying:

> My client agrees with the statement that you sent him.
> I hope that you can resolve this informally.
> Accordingly, feel free to deal with him directly.

(Defendants' Exhibit 9.)

After determining that Johnson agreed with her proposed
complaint, Deese reported her findings to Garvin Few, the Director
of Retail over the Cullman Facility.  Deese relayed the following
information:

---

[11] Deese recalls speaking to Doris Crawford, Devona Calvert, Gina Ray, and
Betsy Andrews.   (Deese Deposition, at 105.)   Some of the witnesses reported
seeing Absher grab and touch Johnson's buttocks.   Gina Ray reported siting with
Johnson's fiancé in December of 1993, where both women saw Absher grab Johnson's
buttocks.   (Deese Deposition, at 106-111.)

13

> I told him ... that I had completed the investigation and
> that I had listened to what was said or what was
> presumably said, I had heard what the witnesses told me
> that they saw, and that there was some conflicting
> information and that some witnesses did appear to me to
> have their own agenda such as Darlene had given them a
> reprimand or whatever and they appeared to be a little
> bitter about it.  By the same token, I felt that the
> incident with the shirt was something that was in poor
> judgment, it was unacceptable, and it put her in a
> position and put the company in a position where ... we
> could be charged with something and that she didn't use
> good judgment on it and that I felt ... not knowing the
> exact story but knowing that part of the story, that she
> should be moved from the department.

(Deese Deposition, at 129.)  Few agreed with the recommendation,

and Deese made plans to return to Cullman to effectuate Absher's

transfer to another department.  The Cullman plant was closed for

the Christmas holidays from December 23, 1994, until January 3,

1995.  (Id., 142.)

On January 3, 1995, Deese delivered the following memorandum

to Darlene Absher:

> We have completed our investigation of claims of sexual
> harassment and retaliation which were brought against
> you.

> Based on the investigation, we conclude that you have
> engaged in behavior which violates Oneita Industries'
> policy prohibiting harassment of other employees.  Your
> objectionable behavior includes both touching and
> comments to employees under your direct supervision.  You
> are being issued a written warning with express
> instructions not to engage in any behavior which is or
> could be interpreted by other employees as harassment,
> particularly sexual harassment.  Further, you are
> directed to have no contact with Alan Johnson.  If you
> feel you are required to deal with Mr. Johnson to perform
> your job, you must inform Joan Anderson prior to making
> any contact whatsoever.  If you engage in any behavior as
> described above, you will be subject to further
> discipline up to and including discharge.

> Further, effective immediately you will begin new
> responsibilities for the prep area.

14

(Plaintiff's Exhibit 11: January 3, 1995 Memorandum from Michelle Deese to Darlene Absher.) The "prep area" division to which Darlene Absher was transferred, "effective immediately," was located on the opposite side of the plant from where she and Johnson had worked together. (Plaintiff's Deposition, at 234.)

Later that same day, Deese met with Johnson to inform him of Absher's reprimand and transfer. (*Id.*, 234.) Johnson said he thought Absher's punishment was not severe enough, but added he did not want her fired. (*Id.*, 235.) In fact, Absher's transfer effectively eliminated the alleged harassment. Johnson and Absher had no further contact after her transfer, and he made no further complaints of harassment. (*Id.*, 108, 276.)

**F. Oneita's Cost Reductions**

As part of an ongoing effort to reduce costs at the Cullman plant, 18 employees were laid off in October of 1994. (Affidavit of Garvin Few, at ¶ 2.) In January of 1995, the team leaders of the Cullman plant held a budget meeting to discuss further possible cost reductions. (Anderson Deposition, at 95.) They "brain stormed" positions that could be eliminated, and Anderson recommended that a Service Operator position, the position Johnson held, be eliminated. (Anderson Deposition, at 99.) Ultimately, it was determined that the towel and gown production line, which Johnson worked on, should be merged into two other lines, and eight positions would be eliminated on February 2, 1995. (Few Affidavit, at ¶ 3.) Both Absher and Johnson were chosen to be laid off.

15

Few asked the Team Leaders responsible for the positions being eliminated to identify the individuals that would be "laid off" in accordance with Oneita policies.[12]   (Few Affidavit, at ¶ 4.)   Oneita has a "plant seniority" system, based on each employee's hire date. (Plaintiff's Exhibit 7:   Oneita's Rules & Regulations, at 22.) Plant seniority is used to "[d]etermin[e] ... which employees to lay off on a given job."   (*Id.*)   The policy notes:

> An employee's seniority regarding ... layoffs is applicable only to his ... current job assignment. Employees do not have seniority on previous jobs. Employees may only exercise seniority on one job – their current job assignment.

(*Id.*)   Thus, when a position is eliminated, the manager is to compare the hire dates of each employee in that position, and the least senior employee is terminated first.

Anderson was given the task of determining who to eliminate from the Service Operator position, because that was a position under her supervision. Anderson determined she could eliminate one of the following seven Service Operators – with their corresponding start dates: (1) Johnson (July 27, 1992); (2) Annette Dean (June 22, 1972); (3) Connie Bozle (October 7, 1974); (4) Debra Turner

---

[12] There is some confusion as to who actually picked Johnson to be terminated. Deese claims "I considered the hire dates of each Sewing Floor Service Operator, the job being eliminated, when determining who would be eliminated as a result of the elimination of the Sewing Line on which Bobby Allen Johnson worked in February 1995." (Defendants' Exhibit 11: Affidavit of Michelle Deese, ¶4.) Yet, Deese's claim that she determined who would be terminated is not supported by the record. When asked at her deposition, "weren't you told by the people in Cullman who the people were who were going to be laid off?", Deese answered, "Yes." (Deese Deposition, at 188.) The evidence supports the conclusion that Few instructed Anderson to determine who should be terminated and that Anderson then merely "provide[d] that information to Ms. Deese so that severance packages could be prepared." (Few Affidavit, at ¶ 4.)

16

(April 11, 1988); (5) Karon Knott (August 27, 1979); (6) Kathy Lee (May 7, 1990); and (7) Theresa Ray (September 14, 1987). (Anderson Deposition, at 108; Plaintiff's Exhibit 8: Cullman Plant Personnel Employee Listing.) In making her determination, Anderson varied from company policy, in that she considered not only employee seniority, but also whether the employees had been reprimanded. (Anderson Deposition, at 110.) Of the seven employees, Johnson was the only one who had reprimands in his file. (*Id.*, 112.) After considering the length of service and the reprimands, Anderson chose to "lay off" Johnson. (*Id.*, 112.)

On February 2, 1995, Deese met with Johnson for approximately 20 minutes, and informed him of the lay-off. She alleges she explained his position had been eliminated. (Deese Deposition, at 205.) Johnson claims Deese instead said he had "stepped on some toes." (Plaintiff's Deposition, at 107.)

## II. JOHNSON'S CLAIM OF HOSTILE WORK ENVIRONMENT DUE TO SEXUAL HARASSMENT

Title VII "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981)(citations omitted).

Courts recognize two forms of sexual harassment: *quid pro quo* sexual harassment; and, hostile work environment sexual harassment. *Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands. *Steele v. Offshore Shipbuilding, Inc.*,

17

867 F.2d 1311, 1315 (11th Cir. 1989), *reh'g denied*, 874 F.2d 821 (11th Cir. 1989). Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele*, 867 F.2d at 1315.

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a)(3)(1981).[13]   Johnson alleges a claim for hostile work environment sexual harassment.[14]

The five elements of a *prima facie* Title VII claim for hostile work environment sexual harassment are:   (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon the employee's sex; (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment";

---

[13] In General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401 (1976), the Supreme Court suggested the degree to which courts should defer to the E.E.O.C.'s interpretation of Title VII: "[w]e consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance...." (citations omitted).

[14] Over a month after defendants filed their motion for summary judgment, plaintiff sought to "clarify" this court's pretrial order through a motion to amend. Plaintiff, for the first time, sought to assert a claim for *quid pro quo* sexual harassment. That request was denied by order entered October 29, 1996.

18

and (5) the employer either knew, or should have known of the harassment, but failed to take prompt remedial action and, therefore, is liable under principles of *respondeat superior*. *Henson*, 682 F.2d at 903-905; *Martin v. Norfolk Southern Railway Company*, 926 F. Supp. 1044, 1050 (N.D. Ala. 1996).

**A.    Johnson's *Prima Facie* Case**

The evidence reveals, and defendants do not dispute that Johnson can establish the first three elements of a *prima facie* case.    Instead, defendants focus upon the last two elements and request that this court make the following determinations as a matter of law:  the alleged harassment was not "sufficiently severe or pervasive" as to create a hostile or abusive working environment; and, Oneita's remedial actions after learning of Johnson's complaints absolve it from liability.

**1.    Sufficiently severe or pervasive conduct**

Title VII does not attempt "to purge the workplace of vulgarity." *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Accordingly, Johnson must demonstrate that Absher's conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Meritor Savings Bank v. Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (1986)(quoting *Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982)).

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.

19

*Harris*, 510 U.S. at 21, 114 S.Ct. at 370.  In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, the court must examine the totality of circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

Numerous courts hold that physical contact with a person's intimate body areas constitutes unlawful harassment, even if it occurs only once.  *See* B. Lindemann & P. Grossman, *Employment Discrimination Law* 795 n.240 (3d ed. 1996).  As the EEOC explained,

> unwelcome, intentional touching of a charging party's
> intimate body areas is sufficiently offensive to alter
> the conditions of [the] working environment and
> constitute a violation of Title VII.  More so than in the
> case of verbal advances or remarks, a single unwelcome
> physical advance can seriously poison the victim's
> working environment.

EEOC Policy Guidance: Sexual Harassment, N-915.035 (quoted in *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840, 844 (2d Cir. 1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1314 (1991), and in *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir.), *cert. denied*, 506 U.S. 1022, 113 S.Ct. 660(1992)).

Johnson alleges that Absher grabbed his testicles on one occasion.  That one event is sufficiently severe to alter the conditions of Johnson's employment and create an abusive working environment.  Johnson also alleges several inappropriate touchings

20

of his buttocks.   Oneita challenges Johnson's credibility, and questions whether the alleged testicle-grabbing incident actually occurred.   It certainly is peculiar that Johnson did not complain about that incident during his employment with Oneita, in his EEOC charge, or the complaint filed herein.   Nevertheless, credibility issues are to be resolved by a jury, not by the court upon motion for summary judgment.

### 2.   Respondeat superior liability

The standard for determining corporate liability due to a supervisor's sexual harassment depends on the type of sexual harassment that occurs.   In a *quid pro quo* case, the corporate defendant is strictly liable for the supervisor's harassment. *Henson*, 682 F.2d at 909-10.   Strict liability is enforced because, when a supervisor requires sexual favors as a *quid pro quo* for job benefits, the supervisor, by definition, acts as the company.   *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989).

On the other hand, strict liability does not attach in a pure hostile environment setting.   In such a case, the supervisor does not act as the company; the supervisor acts outside "the scope of actual or apparent authority to hire, fire, discipline, or promote."   *Steele*, 867 F.2d at 1316.   Thus, corporate liability "exists only through *respondeat superior*; liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor." *Id.* (citations omitted).

21

Oneita's reaction to Johnson's complaints were similar to those of the corporate defendant in *Steele*, 867 F.2d 1311. *Steele* also involved only a hostile work environment claim. When determining the employer took prompt remedial action in response to complaints of supervisory harassment lodged by two employees, the *Steele* court said:

> The corporate employer knew of Bucknole's harassment, and it then took prompt remedial action. The corporate employer sent Forbes [the company's Equal Employment Opportunity Officer] ... to interview the employees; it called Bucknole to New York ... for a reprimand; and it assured the employees that the harassment would stop. Of special importance, Bucknole's harassment ended after the remedial action. The corporate employer, therefore, is not liable for Bucknole's actions under the doctrine of *respondeat superior*.

*Steele*, 867 F.2d at 1316.

Oneita's actions, like those of the defendant in *Steele*, were reasonably calculated to end the harassment and, in fact, did end the harassment. When Johnson complained to Debbie Smith sometime after November 14, 1994, he agreed to allow Smith three weeks to investigate his claim before taking his complaint to the next management level. Within that three week period, Oneita's president was told of the complaint. On December 8, 1994, Deese arrived at the Cullman facility, and she conducted an investigation during the next two weeks. The plant was closed from December 23, 1994 until January 3, 1995. Absher's transfer was effectuated on January 3, 1995, the first day the plant reopened. Thus, less than two months elapsed between Johnson's complaint to Smith and Absher's transfer. Clearly, Oneita's actions were prompt. See *Waymire v. Harris County, Texas*, 86 F.3d 424, 429 (5th Cir.

22

1996)(written reprimand placed in employee's permanent file was prompt remedial measure, "even with the three month delay").

Deese, like Forbes in *Steele*: (1) interviewed the victim of the alleged harassment, Johnson, and other employees at the facility; (2) concluded there was evidence of misconduct; (3) gave the alleged harasser, Absher, a written reprimand; and (4) assured the victim, Johnson, that the harassment would stop. It should be emphasized that by transferring Absher, Deese and Oneita actually went one step further than the defendant in *Steele*. The harasser in *Steele* was allowed to stay in his position as supervisor over the two complaining employees.

Title VII requires the employer to do more than merely request that the offensive employee refrain from discriminatory conduct in the future. *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n.5 (1st Cir. 1980). However, "Title VII does not require an employer to use the most serious sanction available to punish the offender." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244, 144 S.Ct. 1483 (1994). Thus, Oneita was not required to terminate Absher in light of the allegations. (Additionally, Johnson testified he did not request that Absher be fired.) Rather, Oneita was required only to take steps "reasonably calculated to end the harassment." *Garcia v. Elf Atochem*, 28 F.3d 446, 451 (5th Cir. 1994). Oneita is not liable for Absher's actions under the doctrine of *respondeat superior* and, accordingly, Johnson's hostile work environment sexual harassment claim is due to be dismissed.

23

## III.  JOHNSON'S RETALIATION CLAIM

Johnson bears the burden of proving by a preponderance of the evidence that Oneita intentionally retaliated against him.  That can be done either by direct or circumstantial evidence.  When a plaintiff's evidence is circumstantial in nature, however, the Supreme Court has developed a three stage framework for focusing the inquiry.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  First, a plaintiff must establish a *prima facie* case.  To establish a *prima facie* case of retaliation plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

If a plaintiff establishes a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendants to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for the employment action.  *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendants do so, then in the final step of the inquiry plaintiff must have an opportunity to show by a preponderance of the evidence that defendants' stated reasons merely are pretexts for unlawful, discriminatory motives.  *Id.*

24

**A.    Johnson's *prima facie* case**

Oneita does not dispute that Johnson can establish statutorily projected expression (he complained about Absher's harassment), or that he was subjected to an adverse employment action (his termination).   Instead, Oneita asserts that Johnson cannot establish a causal connection between the two events. Johnson's burden is not onerous, however.   Johnson merely must show that "the protected activity and the adverse action were not wholly unrelated."  *Goldsmith*, 996 F.2d at 1163 (citations omitted).

Only two or three months elapsed between Johnson's complaint and his termination.   That temporal proximity is sufficient to establish a causal connection.    *See Donnellon v. Fruehauf Corporation*, 794 F.2d 598, 601 (11th Cir. 1986)("[t]he short period of time [one month] ... between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation"); *Dunning v. National Industries*, 720 F. Supp. 924, 932 (M.D. Ala. 1989)(two months between filing the charge and being subject to adverse employment action is a short enough period to make out a *prima facie* case of retaliation).

**B.    Oneita's Legitimate, Nondiscriminatory Reasons**

Oneita asserts Johnson was laid-off as part of an effort to reduce operating costs, because he was the least senior Service Operator:  "the selection of Plaintiff was a mechanical, completely objective process involving a simple review of the hire dates of the persons in that position."    (Defendants' Brief, at 19-20.)

25

Other courts have held that terminating employees for cost-reduction reasons is sufficient to satisfy a defendant's burden. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125-26 (7th Cir. 1994)(recognizing reduction of salary costs as legitimate, nondiscriminatory reason for termination); *Pearlstein v. Staten Island Univ. Hosp.*, 886 F. Supp. 260, 269 (E.D.N.Y. 1995)(recognizing reduction in force as legitimate reason for termination); *Martin v. Westvaco Corp.*, 850 F. Supp. 83, 90 (D. Mass. 1994)(elimination of plaintiff's position to reduce costs and to ensure viability of that division was legitimate nondiscriminatory reason).

## C.   Johnson's Evidence of Pretext

The record belies Oneita's contention that Johnson's termination was a "mechanical, completely objective process." Joan Anderson was the person who selected Johnson for termination. In making her determination, she considered not only seniority, but also whether an employee had been reprimanded. (Anderson Deposition, at 110.) Johnson was the only Service Operator who had been reprimanded, and both reprimands had been issued by his harasser, Darlene Absher. Anderson, as the supervisor above both Absher and Johnson, clearly was aware of the problems between them. She nevertheless considered Absher's reprimands in making her decision. Thus, Anderson's testimony demonstrates that Johnson's termination was based on more than his lack of seniority.

Johnson also claims that, when Deese informed him of his termination, she said he had "stepped on some toes." (Plaintiff's

Deposition, at 107.) If believed by the trier of fact, Johnson's account of that conversation not only would cast doubt upon Oneita's stated reasons, but also could prove that retaliation was the true reason for his termination. Accordingly, defendants' motion for summary judgment is due to be denied as to Johnson's retaliation claim.

## IV. JOHNSON'S STATE LAW CLAIMS

Johnson presents state law tort claims against Oneita for negligent training and supervision, and, against defendant Absher for invasion of privacy, and for assault and battery.

## A. Negligent Training & Supervision[15]

In Alabama, to recover against an employer under a theory of negligent training or supervision, a plaintiff first must show "by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Ledbetter v. United Am. Ins. Co.*, 624 So. 2d 1371, 1373 (Ala. 1993). Prior to Johnson's complaint, Oneita had not received any other complaints of sexual harassment by Absher. (Anderson Deposition, at 60-61.) Thus, Oneita did not have actual knowledge of any "incompetency" until Johnson complained.

> [W]hen repeated acts of carelessness and incompetency of a certain character are shown on the part of the [employee, it is proper] to leave it to the jury to

---

[15] The Alabama Court of Civil Appeals has noted, "[a]fter reviewing Alabama case law, we see no distinction between claims of wrongful supervision and claims of wrongful training. We, therefore, treat the cases addressing wrongful supervision as applicable to claims of wrongful training." Zielke v. Amsouth Bank, N.A., 1996 WL 465765 (Ala. Civ. App. 1996).

27

> determine whether [those acts] would have come to the
> [employer's] knowledge had the [employer] exercised
> reasonable care.

*Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala.
1995)(emphasis added).  The acts attributed to Absher were not of
such a character so as to put Oneita on notice before Johnson
complained to management.  The only act by Absher which Johnson
claims occurred frequently was the pinching of his buttocks.
Johnson obviously did not consider that act to be severe, because
he waited almost a year to complain to management.  A primary
aspect of sexual harassment is that the contact or conduct is
"unwelcome."  Even if Oneita discovered that Absher pinched
Johnson's buttocks, it could not have determined that the conduct
was "unwelcome" until Johnson complained.   Thus, even in the
exercise of reasonable care and diligence, Absher's conduct would
not have been discoverable until Johnson complained.   Therefore,
Oneita was not put on notice of Absher's "incompetency" until after
Johnson first approached management.

Johnson also must show that breach of the employer's duty to
reasonably supervise or train its employees proximately caused his
injury.  *See Keel v. Banach*, 624 So. 2d 1022, 1026 (Ala. 1993).
The critical issue thus becomes: whether Oneita's actions after it
discovered Johnson's complaint proximately caused injury to
Johnson.  Oneita correctly asserts "[t]he undisputed evidence shows
that Oneita maintains and enforces a sexual harassment policy, that
Oneita trains its managers about sexual harassment, that Plaintiff
was aware of and utilized that policy[,] and that Oneita's

28

enforcement of the policy was effective in ending the harassment."[16] (Defendants' Brief, at 23.)  This court therefore concludes as a matter of law that Oneita's training and supervision of its employees, such as Absher, did not proximately cause any injury to Johnson.   Accordingly, plaintiff's negligent training and supervision claims are due to be dismissed.

### B.   Assault & Battery

"[A]n assault and battery is: 'Any touching by one person of the person of another in rudeness or in anger.'" *Whitlow v. Bruno's, Inc.*, 567 So. 2d 1235 (Ala. 1990)(citations omitted). Absher's alleged grabbing of Johnson's testicles would certainly constitute touching another in rudeness.   Therefore, defendants' motion for summary judgment as to that claim is due to be denied.

### C.   Invasion of Privacy

"The tort of invasion of privacy is the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Wright v. Wright*, 654 So. 2d 542 (Ala. 1995)(citing *Phillips v. Smalley Maintenance Services, Inc.*, 435 So.2d 705 (Ala. 1983)).   Clearly, Johnson's allegation that Absher grabbed his testicles would constitute a wrongful intrusion that would cause shame or humiliation to a person of ordinary sensibilities.   Accordingly, defendants' motion for summary judgment also is denied as to that claim.

---

[16] Deese conducted a training seminar for supervisors on sexual harassment at the Cullman plant in the last quarter of 1994. (Deese Deposition, at 24-25.)

29

## V.   CONCLUSION

For the foregoing reasons, this court concludes that defendants' motion for summary judgment is due to be granted as to plaintiff's Title VII claim for hostile work environment due to sexual harassment and plaintiff's state law negligent supervision and training claims, but denied as to all other claims.  An order consistent with this memorandum opinion will be issued contemporaneously herewith.

DONE this _13th_ day of March, 1997.

_____
United States District Judge

30